[Civ. No. 13431. First Dist., Div. Two. Mar. 26, 1948.]

W. D. KENNEY et al., Respondents, v. HARRY K. WOLFF et al., Appellants.

John J. O'Toole, City Attorney, Bernard J. Ward, Jr., and Jack G. McBride, Deputy City Attorneys, for Appellants.

Milton Marks and Morris Lowenthal for Respondents.

DOOLING, J.—The respondents on this appeal were all employed by the Market Street Railway Company at the time of the acquisition of its system by the city and county of San Francisco on September 29, 1944; and were all "blanketed in" to employment by the city and county as employees of the Municipal Railway, of which the previous Market Street Railway system upon its acquisition became a part. This was done pursuant to that part of section 125 of the San Francisco charter which reads:

"All persons employed in the operating service of any public utility hereafter acquired by the city and county, at the time the same is taken over by the city and county, and who shall have been so employed for at least one year prior to the date of such acquisition, shall be continued in their respective positions and shall be deemed appointed to such positions, under, and entitled to all the benefits of, the civil service provisions of this charter. . . ."

The respondents were severally classified by the San Francisco Civil Service Commission for their employment by the city and county, each being placed in a certain classification which had theretofore been established by that commission for employees of the city and county. Respondents brought this action to compel their reclassification claiming that the classifications in which they had been severally placed were inferior in rank to the positions which they had occupied with the Market Street Railway Company, and hence that they had not been "continued in their respective positions" as required by the positive mandate of section 125 of the charter quoted above. The trial court gave judgment ordering their reclassification and from this judgment the city and county and its civil service commission have taken this appeal.

Certain points urged by the appellants necessitate an outline of the procedure followed by the Civil Service Commission in its adoption of classifications of all employees of the Market Street Railway Company who were continued in the employment of the city and county when the Market Street Railway Company's system was taken over. By a notice dated June 14, 1944, that commission required a form of questionnaire giving information as to the employment status and history of each employee of the Market Street Railway Company to be filled out by each such employee and filed with the commission prior to July 1, 1944. The commission then adopted a tentative classification of all such employees under date of August 2, 1944, and thereupon notified all such employees that protests against such proposed classifications must be filed with the commission not later than August 14, 1944. On August 16, 1944, the commission heard such protests in a public meeting and on the latter date made an order extending the time for filing protests to 5 p. m. on August 18, 1944.

Some of the respondents on this appeal did file written protests within the time so fixed by the commission but most of them did not do so. Appellants argue here, as they did before the trial court, that those who failed to file protests are

barred from relief in the courts by the failure to exhaust their administrative remedies, under the familiar rule exemplified in *Abelleira* v. *District Court of Appeal,* 17 Cal.2d 280, 291 et seq. [109 P.2d 942, 132 A.L.R. 715]. That this is a novel attempt to invoke the doctrine of exhaustion of administrative remedies is obvious. The commission, if the argument is sound, could fix a short time limit (here not over 16 days) within which a group of persons not yet employees of the city and county and not familiar with its classifications of employment must file protests against their tentative classifications for · future employment by the city and county, under penalty of being forever barred from asserting the rights solemnly guaranteed to them by section 125 of the charter to be ''continued in their respective positions.''

In the absence of some provision in the charter giving the Civil Service Commission this power either expressly or by clear implication we cannot hold that it could thus curtail the rights expressly conferred upon respondents by section 125. Appellants point to section 119.1 of the charter which was adopted expressly to enable the city and county to acquire the Market Street Railway system. A portion of subdivision 3 of that section reads:

''Prior to the acquisition of said operative properties, the commission shall submit . . . a budget relating to such unified operation. . . .''

We need not pause to determine whether the power to prepare a budget in advance of the acquisition of the properties would carry with it the extraordinary power to foreclose the rights of an employee of the public utility to be acquired, given him by section 125 of the charter, if he did not file a written protest before the acquisition, for the reason that the commission therein referred to is the Public Utilities Commission by express definition of section 119.1 and not the Civil Service Commission.

We have been pointed to no provision of the charter which we can construe as conferring this particular power on the Civil Service Commission and we are satisfied that the failure of any employee of the Market Street Railway Company to file a protest to his proposed classification on or before August 18, 1944, does not bar him from a remedy in court if he has not in fact been continued in the position which he held with the Market Street Railway.

■ Appellants also assert that respondents' failure to proceed under rule 41 of the Civil Service Commission constitutes

a failure to exhaust their administrative remedies. By an amendment to the answer filed during the trial appellants pleaded rule 41 in *haec verba*. That rule reads:

"Original petitions, or original requests for rulings, must be filed in writing in the office of the Commission before 12 o'clock noon on Monday, and, when so filed, will be heard at the regular meeting to be held on the Wednesday next following. Persons filing such petitions or requests shall, without further notice, be present at such hearings. No oral request for ruling will be considered at a meeting.

"When the Commission has rendered its decision on any original case, such ruling will not be reconsidered unless within thirty days after such ruling the Commission shall consent to reopen the case. Requests for permission to file detailed written petitions for such reconsideration must be made orally to the Commission, within such thirty days, at a regular meeting of the Commission. Any requests for reconsideration made otherwise shall be disregarded."

After pleading the rule the amendment to the answer continues:

"That none of the petitioners . . . complied with Rule 41 of said Civil Service Commission, *that said appeal was available to them for a period of thirty (30) days after the Civil Service Commission acted upon their classification.*" (Italics ours.)

The italicized portion of the answer makes clear that the theory of this defense in the trial court was that under the second paragraph of rule 41 above quoted respondents had 30 days after the original classification to request the commission for permission to file written petitions for reconsideration of their classifications. A reading of rule 41 as a whole, however, makes it clear that the provision for reconsiderations applies only to "any original case"; and that the original cases therein referred to do not include the classification of Market Street Railway employees herein involved, but only the proceedings provided for in the first paragraph of rule 41, i. e., actions had pursuant to "original petitions or original requests for rulings." So construed the rule deals with one subject and is consistent with itself. As appellants would have it construed the provision with regard to reconsiderations would cover a broader field than that covered by the first paragraph dealing with "original petitions, or original requests for rulings." The rule will not reasonably bear that construction.

time on appeal, that under the first paragraph of rule 41 respondents might have filed an original petition with the Civil Service Commission for a reclassification and that by not doing so they failed to exhaust their administrative remedies. This point was not made by the answer nor urged in the trial court. It is too late for appellants to raise it now. No rule is better settled than the one that a party having adopted one theory in the trial court is foreclosed from urging an inconsistent one on appeal. (2 Cal.Jur. 237.)

The complaint alleged that "the respondents have knowingly deprived the following named plaintiffs and petitioners of the positions to which they are entitled pursuant to section 125 of the said charter and have knowingly . . . reclassified and demoted the said plaintiffs and petitioners to inferior and subordinate positions as follows. . . ."

The clerk's transcript contains no demurrer to the complaint, but appellants argue before us that it does not state a cause of action because it does not allege that the commission (quoting from appellants' brief) "acted arbitrarily, fraudulently, capriciously or abused its discretion." There may be some doubt under the language of section 125 of the charter, "shall be continued in their respective positions and shall be deemed appointed to such positions," whether the Civil Service Commission has any discretion in classifying this class of employee. Respondents argue that it has not, but we find it unnecessary to decide that question in this case. Conceding that it has, an allegation that the commission *knowingly* deprived the petitioners of the places to which they are entitled, etc., is sufficient. If the commission classified them in one position *knowing* that they were entitled to another, it acted arbitrarily and capriciously and it abused its discretion.

This brings us to the case on its merits. Section 125 of the San Francisco Charter and its proper construction and application to employees of the Market Street Railway who were continued in the employment of the city and county has been before division one of this court in *Handlon* v. *Wolff,* 72 Cal.App.2d 53 [164 P.2d 46]. Because of its pertinence to the questions before us we quote extensively from pages 58 and 59 of that opinion:

"In effect section 125 provides that if one has been employed for one year in an acquired utility such employee shall be deemed appointed to such position and entitled to 'all benefits' of the service under the municipality. 'Such position' if not the identical position should be interpreted as meaning

a similar position in kind and degree—one that in salary, authority, duties, etc., is reasonably comparable to the employee's former position. If no comparable position exists then it appears that 'such position' by the terms of the charter is 'continued.' The 'position' in the private utility is adopted as a city position. The legislative or administrative means of continuing the employee in his position is a mechanical problem subordinate to the declaration in the freeholder's charter that he 'shall be continued' in his position.

"The portion of the peremptory writ which provides that Handlon is entitled to a position as 'Claims Agent Municipal Railway' from the date of the acquisition, and to enjoy the emoluments thereof, is based upon questions of fact: (1) Are there any positions in the civil service of the municipality which are comparable to that the petitioner held with the private utility? (2) Which position is most comparable to that held by petitioner with the private utility in which position insofar as possible, he is to be continued by the terms of the charter? There is substantial evidence to uphold the court's finding that the position of B 102 General Claims Agent, Municipal Railway was the one most similar to the position held by him in the private utility and the one to which he was entitled under section 125 of the charter.

"Under circumstances not identical but similar in determining the principle involved here, namely, the right of a governmental agency to reclassify, demote, suspend or expel, in *Bruce* v. *Civil Service Board*, 6 Cal.App.2d 633, 637 [45 P.2d 419], the court said: 'A civil service commission derives its powers from the charter creating it and may not exercise any not directly given or necessarily implied from those conferred.' If Handlon had a right to the position of claims agent it was beyond the power of the commission to take that right away. (*Viner* v. *Civil Service Com.*, 59 Cal.App.2d 458 [139 P.2d 88].)"

Appellants insist that the quoted language must be qualified to this extent, that in making its classifications the civil service commission is clothed with discretion and that the courts should not interfere with that classification if reasonable men might differ on the facts as to the propriety of the classifications under attack. Without deciding whether the commission has such a discretion in this particular type of case under section 125, but assuming for the purposes of this decision that it has, we believe that the evidence amply supports the judgment. The respondents testified in detail to their duties, and their questionnaires upon which the civil service com-

mission acted were before the court. The description of the duties of the classifications in which the respondents had been placed and in which they sought to be placed were also before the court. Appellants have not given us the assistance of a detailed analysis of this evidence, contenting themselves with two brief quotations from the evidence of two of the respondents. The respondents on the other hand have assembled the evidence applicable to each respondent and demonstrated the unreasonableness of the commission's classifications and the reasonableness of the trial court's. In appellants' closing brief the accuracy of the summation of the evidence found in respondents' brief is not questioned.

A recitation of all of the evidence would extend this opinion to undue length. We notice the facts as to each respondent or class of respondents very briefly.

### Will B. Bushnell

Bushnell was chief engineer of the Market Street Railway acting directly under the president and general manager and subordinate to no one else in the company. The civil service commission classified him as "F 410 Engineer." The trial court ordered him reclassified as "F 412 Senior Engineer." As "F 410 Engineer" he was subordinate to those in the class "F 412 Senior Engineer." Since he occupied the top engineering position in the Market Street Railway Company the arbitrary action of the civil service commission in demoting him to a subordinate engineering position is clear.

### Earl G. Ryan

Ryan was chief clerk (transportation department) with the Market Street Railway. His classification as fixed by the commission was "B 234 Head Clerk." The court placed him in class "B 68 Chief Clerk." Witnesses for the appellants, including William H. Scott, general manager of the municipal railway, testified that Mr. Ryan occupied the highest clerical position in the transportation department. He was improperly classified in a subordinate clerical class and the court was justified in finding an abuse of discretion in such classification.

### Earl Southard

Southard was chief clerk (stores department) with the Market Street Railway for 31 years. As such he had charge of all clerical work in his department with a senior clerk, senior clerk typist, two other clerks and a foreman under him. He was classified by the commission "B 228 Senior Clerk." The court ordered him reclassified "B 234 Head Clerk."

Under the classification ''B 234 Head Clerk'' the occupant of that class ''supervises a group of subordinates in clerical activities of more than routine nature, or performs unusually responsible clerical work within a department or subdivision thereof,'' while under ''B 228 Senior Clerk'' he ''supervises a group of subordinates performing clerical duties, or performs responsible clerical work.'' Southard's duties with the Market Street Railway included the keeping of records on materials received, purchased and issued; the handling of all freight and express charges and material invoices and the breaking down of all supply costs for the purpose of fixing unit prices on all store requisitions; supervising the sale of scrap on which he set the prices and conducted the sales; and the supervision and responsibility for all inventories, material and supply records. He worked directly under the purchasing agent. That he (quoting from the duties of ''B 234 Head Clerk'') ''performs unusually responsible clerical work'' rather than (quoting from ''B 228 Senior Clerk'') ''performs responsible clerical work'' requires no great astuteness to determine.

## Hobart G. Wilson

Wilson was chief inspector of the Market Street Railway. He had under him an assistant chief inspector, 33 inspectors, one starter and one track oiler. He had, as chief inspector, jurisdiction over all the lines of the Market Street Railway and jurisdiction over all of its inspectors. No similar position had theretofore existed in the municipal railway. He continued to perform the same duties for the municipal railway after the take-over. He was classified ''S 122 Senior Inspector.'' This classification was newly created on September 30, 1944, and a part of the duties of an occupant of this class are described: ''Under general direction is responsible for general supervision of a number of lines of the Municipal Railway.'' It was admitted on the trial that under this classification a position of chief inspector might at any time be created the occupant of which position would have supervision of all of the lines of the municipal railway and would be superior to Wilson as senior inspector. No such position now exists. The court directed that Wilson be classified ''Chief Inspector.'' This guarantees him the continuance of his position with no other inspector over him and the case falls well within the language of the court in *Handlon* v. *Wolff*, *supra*, 72 Cal.App.2d at page 58:

''If no comparable position exists then it appears that

'such position' by the terms of the charter is 'continued.' The 'position' in the private utility is adopted as a city position.''

### Harry J. Reedy

Assistant chief inspector under the Market Street Railway subordinate to Wilson as chief inspector, he was classified ''S 110 Inspector Municipal Railway,'' which put him in the same status as the inspectors of the Market Street Railway whom he had formerly supervised. The propriety of his reclassification by the court as ''S 122 Senior Inspector,'' whereby he was restored to his previous position as directly subordinate to Wilson and superior to the other inspectors, is too obvious to require elaboration.

### Eleanor M. Kenny

Senior clerk-typist in the transportation department of the Market Street Railway, Miss Kenny was classified ''B 512 General Clerk-Typist.'' The court reclassified her ''B 516 Senior Clerk-Typist.'' On the trial the attorney for appellants practically conceded the propriety of this reclassification as the following excerpt from the transcript makes clear:

''Q. (the Court) How about Miss Kenny?

'' (Mr. Ward) We are not going to put in any defense on that. We will leave that to you.''

### Anita E. Rohlfs

Classified ''B 408 General Clerk-Stenographer,'' the court reclassified Miss Rohlfs ''B 412 Senior Clerk-Stenographer.'' As a part of her duties with the Market Street Railway she compiled for responsible officials of the company reports of her own composition from information that she received from various foremen, as well as doing general and confidential stenographic work. The classification in which she was originally placed was the lowest stenographic class and that in which the court ordered her placed properly took into account her more important, responsible and specialized duties with the Market Street Railway.

### Car House Receivers

This comprises a group of seven respondents all performing similar duties. They were car house receivers for the Market Street Railway receiving all money turned in by conductors and bus operators, counting the same and accounting therefor, and preparing token sacks containing a given number of tokens and delivering them to bus operators and conductors for use on their runs. Prior to the acquisition of

the Market Street Railway system car house receivers had for many years been classified as "inspector, municipal railway," a part of the duties of that class being described as "receives and accounts for cash turned in by conductors." Just before the acquisition of the Market Street Railway properties by the city and county the above-quoted language was deleted from the description of the duties of inspector. These respondents were classified as "B 222, General Clerk." Without detailing them it will be sufficient to state that the duties of general clerk are extremely broad and intended to be applicable to a variety of positions throughout the entire municipal structure. Since the deletion of the duties of car house receiver from the inspector classification eligibles from the general clerk classification have been appointed as car house receivers and some inspectors who performed the duties of car house receiver before the deletion have been continued in that employment. These respondents originally sought reclassification as inspectors but after witnesses for appellants had testified that it was planned as soon as possible to fill all positions of car house receiver from the classification of general clerk these respondents asked only to be secured in the type of position which they had held under the Market Street Railway. The court ordered them reclassified as car house receivers. The only result of the judgment in their case is to insure that these respondents, who are engaged in a very specialized type of work, will be continued in that work and not transferred to some other of the multifarious duties embodied in the general clerk's classification. This result would seem to be compelled by the language of section 125 that they be "continued in their respective positions."

█ Appellants make some complaint that respondents should have been limited in the trial court to the description of their duties given in their respective questionnaires. If it was error to receive additional evidence on this point appellants have not shown wherein it was prejudicial since they have not pointed out any case in which the facts recited in the questionnaire would not support the judgment rendered.

Judgment affirmed.

Nourse, P. J., and Goodell, J., concurred.

A petition for a rehearing was denied April 24, 1948, and appellants' petition for a hearing by the Supreme Court was denied May 20, 1948.